IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HOTEL EQUITY FUND V, L.L.C., | ) | Case No. 10-10951 (BLS) |
| | ) | |
| Alleged Debtor. | ) | |
| | ) | Hearing Date: To be determined |
| | ) | Objection Deadline: To be determined |

**MOTION OF WELLS FARGO BANK, NATIONAL ASSOCIATION, AS SUCCESSOR BY MERGER TO WACHOVIA BANK, NATIONAL ASSOCIATION, AS SPECIAL SERVICER ON BEHALF OF BANK OF AMERICA, N.A., AS SUCCESSOR BY MERGER TO LASALLE BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE BENEFIT OF THE HOLDERS OF WACHOVIA BANK COMMERCIAL MORTGAGE TRUST, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-WHALE 8 FOR AN ORDER (A) DISMISSING THE BANKRUPTCY CASE AND (B) SANCTIONING CAPSTEAD MORTGAGE CORP. AND REDTAIL CAPITAL PARTNERS ONE, LLC PURSUANT TO 11 U.S.C. § 303(i)**

Wells Fargo Bank, National Association, successor by merger to Wachovia Bank, National Association, as special servicer ("Wells Fargo") on behalf of Bank of America, N.A., as successor by merger to LaSalle Bank National Association, as Trustee for the benefit of The Holders of Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2007 Whale 8, by and through its counsel, moves (the "Motion") the Court for entry of an order (i) dismissing the bankruptcy case (the "Case") filed on March 19, 2010 ("Petition Date") against Hotel Equity Fund V, L.L.C. (the "Alleged Debtor") by Capstead Mortgage Corp. ("Capstead"), Berglund Architects, LLC and Island Water World (together, the "Petitioning Creditors"), pursuant to 11 U.S.C. §1112(b) and (ii) sanctioning Capstead and its affiliate Redtail Capital Partners One, LLC for the benefit of the Alleged Debtor, pursuant to 11 U.S.C. § 303(i). In support of its Motion, Wells Fargo states as follows:

## INTRODUCTION

1. This involuntary Case should be dismissed because it was filed in bad faith by Capstead as (i) the parent company of an out of the money loan participant and (ii) the holder of

a claim manufactured for the sole purpose of bringing the petition. Good cause exists to dismiss the Case because it will result in a substantial and continuing loss to the estate with no reasonable likelihood of rehabilitation.

2. The Alleged Debtor is a single-purpose entity which owns Four Seasons Resort, Nevis, a luxury resort hotel located on the island of Nevis in the Country of St. Kitts and Nevis (the "Property"), whose assets are fully encumbered by the liens securing the Loan (as defined below). The October, 2009 appraised value of the Property is $98,700,000,[1] and the Property is subject to a mortgage loan in the principal amount of $126,700,000.00 (the "Loan") being serviced by Wells Fargo.[2] The Property is managed by Four Seasons Hotels and Resorts N.V. The Property was damaged by Hurricane Omar in October 2008 and is currently closed. Unliquidated insurance claims for hurricane damage to the Property are additional collateral for the Loan.

3. This case is merely the continuation of a dispute between loan participants. Petitioner Capstead's wholly owned subsidiary, Redtail Capital Partners One, LLC ("Redtail")[3]

---

[1] Cushman & Wakefield of Illinois, Inc. ("Cushman") prepared an "as-is" appraisal dated as of October 28, 2009 that valued the Property at approximately $98,700,000 (representing completed value less estimated $4.3 million of uninsured improvements) and $103,000,000 "as completed" with an estimated open date of November 1, 2010. Consequently, the current value of the Property is substantially less than the principal balance of the Loan, $126,700,000, not including accrued and unpaid interest, advances and other fees and charges.

[2] The Loan was originated by Calyon New York Branch in the amount of $126,700,000.00 in October 2005 and is now serviced by Wells Fargo. As of the Petition Date, the Alleged Debtor's aggregate outstanding obligations under the Loan were in the principal amount of approximately $126,700,000, plus accrued interest in the sum of approximately $7 million, plus fees, expenses and other costs reimbursable to Wells Fargo under the Loan documents in excess of $30,000,000.

[3] Capstead's 2006 Annual Report states that in July 2005, Capstead and Crescent Real Estate Equities Company (NYSE: CEI) formed Redtail Capital Partners, L.P. ("Redtail Capital"), a limited partnership owned and capitalized 75% by Capstead and 25% by CEI, for the purpose of investing in a leveraged portfolio of subordinate commercial real estate loans that meet certain criteria over a two-year investment period ending in July 2007. Capstead's 2008 annual report states that "on November 9, 2007 Capstead acquired for $4.0 million the remaining 25% outside interest in Redtail Capital Partners, L.P., a commercial real estate loan limited partnership." Finally, Capstead's most recent 10-K (filed February 26, 2010) (i) lists Redtail Capital Partners LP and Redtail Capital Partners One, LLC as subsidiaries and (ii) that (a) CMC Real Estate Capital L.P owns 100% of the limited partnership interests of Redtail Capital Partners, LP, with CMC Real Estate Capital GP, LLC holding the remaining general partner interest and (b) Redtail Capital Partners LP is the sole member of Redtail Capital Partners One, LLC.

is an out of the money participant in the Loan. Redtail has repeatedly urged the Alleged Debtor to file for bankruptcy in order to reject the Management Agreement with the Four Seasons on the theory that rejecting the management agreement will enhance the value of the Property. Wells Fargo, as the special servicer for the Loan, and other loan participants have, after due consideration and analysis, consistently rejected Redtail's suggestion.

4. Upon information and belief, Capstead, in knowing violation of the Alleged Debtor's governing documents and the Loan agreement "loaned" $275,000 to the Alleged Debtor in order to become a Petitioning Creditor in this Case, and offered bribes to other creditors to bring the petition. The Petition could be dismissed merely because of the *bona fide* dispute regarding Capstead's claim.

5. Even if Capstead succeeds in correcting this deficiency, the Case should be dismissed because of the certainty of loss to the secured lenders and the devastating effect it will have on the many creditors and citizens of Nevis. This involuntary Case has delayed a foreclosure sale scheduled for March 25, 2010 that would have led to a re-opening of the resort in November 2010, and unfairly shifts the entire economic risk of loss for the Property to Wells Fargo and the Loan participants. This Case has caused reconstruction funding to cease, and jeopardized the timely reopening of the Property, which will certainly result in a continuing loss or diminution of Property value to the estate. There is not even a pretense of adequate protection. The solution is an immediate dismissal.

## FACTS

6. Upon information and belief, this involuntary Case was orchestrated by Redtail, an out of the money participant in the Loan, as part of a pattern of interference expressly prohibited by an agreement among the loan participants. There are six participation interests in

the Loan. The Participation and Servicing Agreement dated as of December 16, 2005 by and among Calyon New York Branch (now known as Credit Agricole Corporate & Investment Bank) ("Credit Agricole"), Redtail and Ashford Hospitality Finance LP ("Ashford") (the "Participation Agreement") provides, in pertinent part, that the servicer of the Loan (i.e., Wells Fargo) has the sole authority to make all decisions with respect to the Loan or the Property, subject to approval rights granted to the "controlling holder" for certain decisions. The "controlling holder" is the most junior loan participant that has at least approximately 25% of its investment secured by the collateral for the Loan (i.e., the Property). The "controlling holder" may change from time to time depending upon, among other things, the then value of the Property and the outstanding indebtedness of the Loan.

7. The note evidencing the Loan had an original maturity date of October 9, 2008, subject to two one-year extensions and was non-recourse with standard carve-outs from the non-recourse provisions. The Alleged Debtor did not meet all of the conditions for an extension. As a result, the full unpaid balance of the Loan became due and payable on October 9, 2008. At the end of December 2008/early January 2009, Wells Fargo commenced a foreclosure action against the Alleged Debtor in Nevis.

8. After lengthy negotiations with the Alleged Debtor regarding a proposed extension of the original Loan, the Alleged Debtor notified Wells Fargo in February 2009 that it was no longer interested in retaining the Property and discontinued participation in the restoration and the preparation of the insurance claim relating to the hurricane damage. Wells Fargo then continued to move forward with its foreclosure proceeding. Wells Fargo was forced to take over the restoration and infuse its own capital in order to protect its collateral because the

Alleged Debtor lost interest in restoring the resort due to its having no equity in the Property and being in default under the Loan.

9. On July 8, 2009 Redtail, as a junior, non-controlling loan participant under the Loan, obtained a temporary restraining order to block a foreclosure sale of the Property previously scheduled for July 9, 2009. At such time Redtail believed that it should have been determined to be the "controlling holder" of the Loan, and had commenced litigation against Wells Fargo and the then "controlling holder," Ashford[4], in Texas state court in January 2009 alleging such claim. With certain limitations, Redtail displaced Ashford as "controlling holder" in September, 2009. Redtail dismissed the action in October 2009.

10. In December, 2009, due to the continuing decline in the Property's value and increase in the Loan balance, Redtail was displaced as the "controlling holder"[5] by Credit Agricole. Redtail has not disputed this fact.

11. On March 19, 2010, Redtail resorted to causing this Case to be filed by its parent company, Capstead, to block the foreclosure sale scheduled for March 25, 2010.[6]

12. The facts show that Redtail through its affiliate Capstead is doing indirectly what it cannot do directly, which is to put the Alleged Debtor into bankruptcy, thereby exercising

---

[4] At the time the Loan was originated in 2005, Ashford Hospitality Finance LP was the most junior loan participant and therefore was the "controlling holder."

[5] Based upon a decrease in the value of the Property as reflected in the appraisal prepared by Cushman, both Ashford and Redtail no longer have sufficient portions of their initial investments secured by the Property (i.e., less than 25% of their investments are now secured by the current value of the Property), and therefore, Credit Agricole became, and continues to be at this time, the new "controlling holder" under the Participation Agreement. All of the participants, including Redtail, were informed of the change in the "controlling holder" in December of 2009.

[6] Wells Fargo intends to investigate the Petitioning Creditors, particularly Capstead, to determine facts relating to this involuntary bankruptcy filed virtually on the eve of a foreclosure sale. One fundamental question is how the alleged $275,000 unsecured loan was made by Capstead to the Alleged Debtor, since the Alleged Debtor is a single purpose entity and is prohibited from borrowing additional money. On March 23, 2010, counsel for Wells Fargo contacted counsel for Capstead and Redtail and requested documents and information about the alleged loan, but were told that counsel was not currently representing Capstead in connection with this involuntary bankruptcy case and declined to voluntarily produce documents regarding the basis of the claim asserted by Capstead against the Alleged Debtor.

control over the Loan. Section 20 (Exercise of Remedies by the Servicer) of the Participation Agreement, which governs the relationship among the Loan participants, prohibits any junior participant (and Redtail is such a junior participant) from taking or causing legal action to be taken to enforce or protect the Lender's rights with respect to the Loan, including, without limitation, the filing of any bankruptcy petition against the Alleged Debtor.[7] Capstead's and Redtail's involvement in filing or causing this involuntary case to be filed against the Alleged Debtor clearly violates the Participation Agreement.

13. Redtail does not need this Petition to protect its economic interests. Redtail has the right under Section 11 of the Participation Agreement to exercise an option to purchase each of the participation interests in the Loan that are more senior to Redtail's interest. Redtail has not exercised this right and is well aware of the status of the Loan, the Property and all of the servicing advances which Wells Fargo has made in connection with the Loan.

14. Instead, Redtail is attempting to shift the burden of its speculative plan to reject the Four Seasons Management Agreement on to the Loan participants and other creditors of the Alleged Debtor.

---

[7] Specifically, the Participation and Servicing Agreement dated as of December 16, 2005 initially by and among Calyon New York Branch, Redtail Capital Partners One, LLC and Ashford Hospitality Finance LP states, in pertinent part in Section 20, as follows: "Subject to the terms of the applicable Servicing Agreement, the Participation A Holder and each Junior Participation Holder agree that the Master Servicer (or other Person entitled in accordance with the applicable Servicing Agreement to act on behalf of the Holders),...shall have the sole and exclusive authority with respect to the administration of, and exercise of rights and remedies with respect to, the Mortgage Loan, including, without limitation, the sole and exclusive authority ...to take legal action to enforce or protect the Holders' interests with respect to the Mortgage Loan, including the right at any time to...institute any foreclosure action..." Section 20 goes on to state that "Except when exercising its rights as the Controlling Holder,...each Junior Participation Holder agrees that it shall have no right to, and hereby presently and irrevocably assigns and conveys to the Participation A Holder (or either Servicer or the Trustee (if any) acting on behalf of the Participation A Holder), the rights, if any, that any Junior Participation Holder has...(ii) to exercise any remedies with respect to the Mortgage Loan, including, without limitation, filing or causing the Participation A Holder or the Participation A Holder and the Master Servicer to file any bankruptcy petition against Mortgage Loan Borrower...or (ii) to vote any claims with respect to the Mortgage Loan in any bankruptcy, insolvency or similar type of proceeding of the Mortgage Loan Borrower."

Electronic copies of the Participation and Servicing Agreement are available upon request.

15. There are also compelling economic reasons, separate and apart from the disputed claim and bad faith issues raised in this Motion, why this involuntary petition must be dismissed *immediately*. Dismissal will avoid delay, which in addition to impairing Wells Fargo's collateral, will have a profound adverse economic impact on the residents and government of the Island of Nevis.

16. Wells Fargo seeks to complete the foreclosure sale of the Property in order to complete the restoration of the Property and to re-open the resort. This strategy has been strongly supported by the government of Nevis. One of the primary reasons why this is important is that the resort directly and indirectly employs a substantial number of residents of Nevis---an island that is suffering from steep unemployment as a result of the resort closing in 2008 due to hurricane damage. [8] The resort is the largest employer in Nevis and directly employs 20% of the adult workforce, not to mention the substantial number of additional residents that earn their living from indirectly servicing guests at the resort. Wells Fargo, if successful in foreclosing on the Property, had planned to complete the restoration of the resort with a view toward re-opening the resort on or about November 1, 2010 --- the commencement of the high tourist season in Nevis.

17. Part of the restoration and re-opening process includes ordering furniture, fixtures and equipment. It takes at least six or seven months to design, place orders and receive and install such furniture, fixtures and equipment. Wells Fargo anticipated that it would complete the foreclosure during the week of March 22, 2010 and be in a position to move forward to complete the restoration and re-opening. This bad faith and unauthorized involuntary bankruptcy Case, if not *immediately* dismissed, will prevent Wells Fargo from completing the foreclosure sale,

---

[8] The Premier of Nevis has expressed his concern about these issues in his statement, a copy of which is annexed to this Motion as Exhibit A.

placing orders and re-opening the resort as planned. Stated differently, if there is a delay, the orders may not be placed in time to re-open the resort in November 2010. If the resort does not open on or around November 1, 2010, it will have then missed the high season of operations, which will likely have a crippling effect on the value of the Property from which it may never recover, and in fact, may remain shuttered permanently. All of the residents of Nevis, not simply those that potentially were to be directly employed at the resort, will suffer. Therefore, Wells Fargo should not be subjected to additional delay in seeking to foreclose on its collateral.

18. Moreover, indicia of bad faith abound:

a. As discussed in more detail below, Capstead's claim is allegedly based on an alleged unsecured loan to the Alleged Debtor which is an unauthorized transaction. Capstead's alleged unsecured loan violates the Loan documents and the specific covenants in the Alleged Debtor's operating agreement that expressly prohibit the Alleged Debtor from borrowing money or incurring debt, other than the Loan, except in the ordinary course of business, within certain prescribed parameters. The alleged unsecured loan is not authorized. Both Redtail and Capstead know full well that this loan by Capstead cannot be authorized by the Alleged Debtor. However, in the face of such knowledge, Capstead, presumably with the knowledge and acquiescence of Redtail, proceeded to file the involuntary petition.

b. Further adding to the bad faith filing of the Case is a declaration of Hilary Lightfoot, a taxi driver in Nevis, stating in substance that he was paid $200 by a man named *Tony from Texas* to sign a document which Wells Fargo believes may have been an involuntary petition against the Alleged Debtor. A copy of the declaration is annexed as Exhibit B. Lightfoot states "After they left, I thought about what had happened at first I thought that they were representing Four Seasons but after they gave me the second hundred dollar asked me to sign the form I felt that they were trying to bribe me in to signing the form." One of the principals of or consultant for Capstead is *Anthony Page*. Capstead's office is located in Texas. Upon information and belief, Mr. Page was in Nevis at or around the time that Mr. Lightfoot spoke with Tony from Texas.

c. Significantly, the Petitioning Creditors have failed to serve their Petition on the Alleged Debtor, preferring, apparently, to gain a tactical advantage by stalling the reconstruction of the Property and delaying its opening.

19. Finally, any reorganization of this Alleged Debtor is hopelessly unrealistic. The Property cannot service the Loan. Millions of dollars are needed merely to reopen. Wells Fargo

12201103v.8
DEL 86,313,017v1 4-1-10

is undersecured, and would control any class of unsecured claimants. There is no reasonable prospect for reorganization.

20. In summary, Redtail's obstructive behavior in seeking to block foreclosure sales clearly evidences a "pattern of conduct" that is costly, diminishes the value of the Property and injures third parties while serving no reasonable business purpose. Wells Fargo seeks dismissal of the Alleged Debtor's bankruptcy case pursuant to Bankruptcy Code Section 1112(b).

## JURISDICTION AND VENUE

21. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and Internal Operating Procedure 15(a) of the United States District Court for the District of Delaware. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

22. The statutory predicates for the relief requested herein are (a) Bankruptcy Code Sections 303(i), 1112(b), (b) Federal Rules of Bankruptcy Procedure 1017, 4001, 7034, 9013, 9014, and 9034, and (c) Local Bankruptcy Rule 4001-1.

## RELIEF SOUGHT

23. By this Motion, Wells Fargo seeks the entry of an order (a) dismissing the Alleged Debtor's Case pursuant to Bankruptcy Code section 1112(b) and (b) sanctioning Redtail and Capstead pursuant to Section 303(i) of the Bankruptcy Code for the benefit of the Alleged Debtor.

## ARGUMENT

**I    This Court Should Dismiss The Alleged Debtor's Bankruptcy Case For "Cause" Pursuant To Bankruptcy Code Section 1112(b) .**

24. Bankruptcy Code section 1112(b) authorizes the dismissal of a bankruptcy case for "cause." *See* 11 U.S.C. § 1112(b). Although "cause" is not defined in the Bankruptcy Code,

12201103v.8
DEL 86,313,017v1 4-1-10

section 1112(b)(4) sets forth a non-exhaustive list of factors that can constitute cause for dismissal. "A bankruptcy court has broad discretion under 11 U.S.C. § 1112(b) to dismiss a Chapter 11 case for cause." *In re Woodbrook Assocs.*, 19 F.3d 312, 316 (7th Cir. 1994).

25. As set forth below, "cause" exists to dismiss the Case based on the (a) bad faith and unauthorized filing by Capstead; (b) the likelihood of substantial or continuing loss to the estate and (c) the Alleged Debtor's inability to propose a confirmable Chapter 11 plan.

### A. Redtail's Continuing and Unauthorized Interference with Foreclosure Proceedings Constitutes "Cause" To Dismiss The Case.

26. Redtail's continuing interference with foreclosure, attempt to speculate with other Loan participants' collateral and other *indicia* of bad faith constitute cause for dismissal. In the Third Circuit, it is well-settled that a lack of good faith in the filing of a chapter 11 petition constitutes cause for dismissal and the ultimate burden is on the bankruptcy petitioner to establish that its petition has been filed in good faith. *In re Integrated Telecom Express Inc.*, 384 F.3d 108, 118 (3d Cir. 2004); *In re PPI Enters. (U.S.), Inc.*, 324 F.3d 197, 211 (3d Cir. 2001); *In re SGL Carbon Corp.*, 200 F.3d 154, 159-62 (3d Cir. 1999). The burden of proof on a motion seeking dismissal for "cause" is a shifting one. Wells Fargo acknowledges that it, as movant, has the initial burden. *See Mazzeo v. Lenhart (In re Mazzeo)*, 167 F.3d 139, 142 (2d Cir. 1999) (discussing burden shifting on seeking relief from the automatic stay "for cause"). However, once good faith is called into question, the burden shifts to the other party to demonstrate that the bankruptcy case was commenced in good faith. *In re Syndicom Corp.*, 268 B.R. 26, 49 (Bankr. S.D. N.Y. 2001); *In re Muskogee Envtl. Conservation Co.*, 236 B.R. 57, 59 (Bankr. N.D. Okla. 1999) (citations omitted). That burden cannot be satisfied here.

27. Whether the good faith requirement has been satisfied is a "fact intensive inquiry" in which the court must examine "the totality of facts and circumstances" and determine where a

10

12201103v.8
DEL 86,313,017v1 4-1-10

"petition falls along the spectrum ranging from the clearly acceptable to the patently abusive." *SGL Carbon*, 200 F.3d at 162. In this inquiry, of critical importance in the Third Circuit are: (1) whether the petition serves a valid bankruptcy purpose, such as preserving a going concern or maximizing the value of the debtor's estate for creditors, and (2) whether the petition is filed merely as an attempt to gain a tactical advantage. *Integrated Telecom*, 384 F.3d at 119-120. This involuntary bankruptcy petition was filed as part of a continuing pattern to thwart Wells Fargo's effort to enforce its secured claims in the estate's only significant asset or source of revenue. This alone is not a proper basis for a chapter 11 filing. *See, e.g., In re 4 C Solutions, Inc.*, 289 B.R. 354, 364 (Bankr. C.D. Ill. 2003) ("The two recognized policies underlying Chapter 11 are preserving going concerns and maximizing property available to satisfy creditors.") (*citing Bank of America Nat. Trust and Savings Assn. v. 203 North LaSalle Street P'ship*, 526 U.S. 434, 453 (1999)).

28. Staying the foreclosure jeopardizes the reconstruction of the Property, and impermissibly shifts the risk of loss to other Loan participants. Redtail is expressly prohibited under the Participation Agreement from filing bankruptcy against the Alleged Debtor. The purpose of this prohibition, which is also underscored by the "controlling holder" mechanism, is to avoid interference with the rights of at risk participants. Where Redtail and Capstead have intentionally and knowingly employed the Bankruptcy Code's involuntary case provisions to circumvent the Participation Agreement and place participating lenders at risk, the Bankruptcy Court should dismiss the Petition.

29. Several months ago, Redtail interfered with Wells Fargo's original attempt to foreclose on the Property. More recently, Redtail proposed that Wells Fargo fund the retainer of counsel to file a bankruptcy case on behalf of the Alleged Debtor. A detailed presentation was

made by the Alleged Debtor and counsel for the Alleged Debtor in order to persuade Wells Fargo and Credit Agricole, the current "controlling holder" of the Loan, to agree to a consensual prepackaged bankruptcy and fund the costs of the bankruptcy proceeding. Both Wells Fargo and Credit Agricole rejected Redtail's speculative plan to use bankruptcy to reject the Four Season's flag and management agreement, refused to support any bankruptcy filing by the Alleged Debtor and proceeded to foreclose upon the Property.

30. Having failed to convince Wells Fargo and the controlling holder of the merits of its proposal, Redtail turned to using the Bankruptcy Code to do indirectly what it was prohibited from doing directly. Capstead, the affiliate of Redtail, claims to have made an unauthorized loan to the Alleged Debtor *(who walked away from the Property)* and has used that purported loan as a basis to file an involuntary bankruptcy petition against the Alleged Debtor, virtually on the eve of the foreclosure sale. Upon information and belief, based on the parent/subsidiary relationship between Capstead and Redtail, Capstead is equally familiar with the status of the Property and has intentionally engaged in acts which clearly violate the terms of the Participation Agreement and the Debtor's own governing documents and are intended to disrupt, hinder and delay Wells Fargo's exercise of its right as the special servicer to foreclose on the Property.

31. Further, Wells Fargo submits that Capstead is not qualified to be a petitioning creditor because there is a *bona fide* dispute as to liability of its claim based upon its alleged loan to the Alleged Debtor. *See* 11 U.S.C. §303(b) (petitioning creditors claims cannot be the subject of a *bona fide* dispute as to liability or amount). A copy of the petition filed by Capstead is annexed as <u>Exhibit C</u> to this Motion which describes the nature of Capstead's claim as an "unsecured loan" in the sum of $275,000. The Alleged Debtor was formed as a special purpose entity in connection with the Loan transaction. It is prohibited under the Loan documents from

borrowing money or incurring debt (other than the Loan), except for certain exceptions expressly set forth in the Loan documents. Further, the Alleged Debtor's First Amended and Restated Operating Agreement also prohibits such borrowing or incurring of debt.[9] Therefore, the alleged loan made by Capstead to the Alleged Debtor violates the Loan Agreement and the Alleged Debtor's Operating Agreement and is an unauthorized act.

32. Capstead's bad faith is underscored by the existence of alternatives to this Case. As set forth above, Redtail has the opportunity to buy out the senior participation interests in the Loan and take control of the Loan. Instead of accepting the economic risk and proceeding with its plan, it is using an involuntary proceeding to put the participating lenders and other creditors at risk. This Court should not endorse Redtail's tactics by permitting this Case to continue.

33. While there is no particular test for determining bad faith, "the courts may consider any factors which evidence 'an intent to abuse the judicial process and the purposes of

---

[9] Exhibit E of the Loan Agreement provides that Borrower has not and will not, so long as the Loan remains unpaid: incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than Permitted Debt (and debt to Four Seasons which is being repaid with the proceeds of the Loan). Permitted Debt is defined in the Loan Agreement as (i) the Loan, (ii) trade payables incurred in the ordinary course of Borrower's business, paid by Borrower within sixty (60) days of incurrence and in fact not more than sixty (60) days outstanding (subject to Borrower's right to contest the same in accordance with the Loan Documents), provided that in no event shall the aggregate amount of such trade payables incurred by the Borrower exceed three and one-half percent (3.5%) of the Loan, (iii) purchase money indebtedness and capital lease obligations incurred in the ordinary course of business provided that annual payments thereunder do not exceed $500,000 in the aggregate, (iv) any Management Fees not yet due and payable under the Management Agreements, (v) Impositions or other charges not yet due and payable or delinquent or which are being diligently contested in good faith in accordance with the Loan Documents, (vi) indebtedness relating to liens in respect of property or assets imposed by law which were incurred in the ordinary course of business, such as carriers', warehousemen's, landlord's, mechanic's, materialmen's, repairmen's and other similar Liens arising in the ordinary course of business and liens for workers' compensation, unemployment insurance and similar programs, in each case arising in the ordinary course of business which are either not yet due and payable or being diligently contested in good faith in accordance with the Loan Documents, (vii) the FSRE Loan, (viii) amounts payable in the ordinary course of business (and not as a result of Borrower's delinquency or default) pursuant to Permitted Exceptions and (ix) such other unsecured indebtedness approved by Lender in its sole discretion or, following a Secondary Market Transaction, with respect to which Lender has received a Rating Confirmation.

Schedule B of the Alleged Debtor's Operating Agreement and the definition of Permitted Debt in the Operating Agreement are identical to the aforementioned provisions in the Loan Agreement.

Electronic copies of the Loan Agreement and the Alleged Debtor's Operating Agreement are available upon request.

13

the reorganization provisions' or in particular, factors which evidence that the petition was filed to delay or frustrate the legitimate efforts of secured creditors to enforce their rights.'" *In Re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1394 (11th Cir. 1988); *see also Original IFPC S'holders*, 317 B.R. 738, 750 (Bankr.N.D.Ill. 2004) ("Courts generally consider the totality of circumstances surrounding a variety of objective and subjective indicators.") (citations omitted).

34. Aggravating factors abound in this case. Capstead has not served the petition. "Tony," presumably Anthony Page of Capstead, offered potential petitioners money in order to gain their trust and participation. Capstead's claim is disputed. The Alleged Debtor has given up on the Property. As discussed below, substantial funds need to be invested in the Property so that it may re-open and generate revenue. The Case should be dismissed.

**B. Substantial or Continuing Loss to Or Dimunition of the Estate Is Grounds To Dismiss This Case.**

35. Dismissal of a bankruptcy case is appropriate where there is "substantial or continuing loss to or diminution of the estate". 11 U.S.C. §1112(a)(4)(A). The Property has not operated since being damaged in October, 2008 by Hurricane Omar. The monthly "burn" rate to merely maintain the Property is between $900,000-$1,500,000, depending upon the month. This includes salaries to workers at the hotel, utilities, payment to vendors, and other operational costs. An immediate multi-million dollar investment and several month lead time is necessary to restore the Property in time for a high-season opening in November, 2010. It will likely cost at least an additional $35 million to reopen the resort, which includes, among other things, completion of restoration, new FF&E, building shoreline defenses to protect against storm surges as required by the insurance carrier, sewer lift station repairs, repairs to breakwaters, new landscaping, restoration of the dock, and numerous other pre-opening expenses. Although Wells Fargo has advanced millions of dollars of its own funds to date to move forward with the

restoration of the Property, millions more will need to be expended to complete the restoration, pay for new furniture, fixtures and equipment that were destroyed by Hurricane Omar and pay for other re-opening expenses. These facts alone justify the immediate dismissal of the Case.

36. Wells Fargo is not willing to make any additional investment in the Property while the Property's future is uncertain.

37. The Alleged Debtor has given up on the Property. The Petitioning Creditors have not even served the Alleged Debtor, and have most recently premised a reorganization plan on an epic battle to reject the Four Season's Management Agreement. There is no evidence of ability or intent of the Petitioning Creditors to fund reconstruction.

38. Under these circumstances, a continuing loss and diminution in collateral value are the natural and predictable consequences. These consequences can be avoided by dismissing the Case and permitting Wells Fargo the certainty necessary to make the investment in restoring the Property and returning it to revenue producing status.

    C.    **The Alleged Debtor's Inability To Propose A Confirmable Bankruptcy Plan Is Grounds To Dismiss Its Case.**

39. Dismissal of a bankruptcy case is also appropriate where a debtor is unable to effectuate a plan. *See Woodbrook Assocs.*, 19 F.3d at 316. ("A § 1112(b)(2) dismissal is proper if the court determines that it is unreasonable to expect that a plan can be confirmed in the Chapter 11 case.") (citations omitted). Grounds for dismissal exist if it is clear on the filing date that "there was no reasonable likelihood that the debtor intended to reorganize and no reasonable probability that it would eventually emerge from bankruptcy proceedings." *In re C-TC 9th Ave. P'ship*, 113 F.3d 1304, 1309 (2d Cir. 1997). *See also In re Squires Motel, LLC*, 416 B.R. 45, 49 (Bankr. N.D.N.Y. 2009)("[T]he standard in this circuit is that a bankruptcy petition will be

dismissed if both objective futility of the reorganization process and subjective bad faith in filing the petition are found.")

40. As discussed in detail below, the Alleged Debtor has no reasonable likelihood of a successful reorganization in this Case. The Alleged Debtor has no assets from which it can generate revenue other than the Property, and given the current status of the Property, the Alleged Debtor cannot generate revenues sufficient even to satisfy the debt service to Wells Fargo. The Alleged Debtor has no outside source of revenue or capital that can be reused to repay the millions of dollars due to Wells Fargo. Indeed, the Alleged Debtor has repeatedly informed Wells Fargo that its investors will not contribute any equity to the Property and the Alleged Debtor has effectively walked away from the Property. Moreover, Maritz Wolff, the asset manager of the Alleged Debtor, is an additional insured under the Alleged Debtor's business interruption insurance policy and it has refused to execute necessary documents required by the insurance companies in order for the insurance companies to disburse proceeds to be used for operations and restoration. As a result, this Court should dismiss the Case.

41. The Property cannot fund its own reconstruction. The revenue generated by the Property, primarily dues from Villa owners and golf course operations, are insufficient to restore the resort to full operation. Insurance proceeds which could otherwise be used for restoration are not being disbursed as a result of the inactions of Maritz Wolff.

42. The only source of funding for the Property is Wells Fargo. Neither the Alleged Debtor or the Petitioning Creditors have indicated the intent or ability to restore the underlying resort operations. In fact, on March 26, 2010, Wells Fargo expressly requested that the Alleged Debtor and the Petitioning Creditors consent to the restoration of the Property and provide funding for the restoration. *See* letter dated March 26, 2010, attached hereto as <u>Exhibit D</u>.

16

12201103v.8
DEL 86,313,017v1 4-1-10

Neither has been forthcoming. The Alleged Debtor responded that it was not up to it to decide. *See* response dated March 29, 2010, attached as <u>Exhibit E</u>. The Petitioning Creditors have not responded at all.

43. The absence of a plan to restore operations is fatal. This Case should be dismissed.

## **REQUEST FOR DISCOVERY AND AN EVIDENTIARY HEARING.**

44. Wells Fargo intends to serve discovery on one or more of the Petitioning Creditors and the Alleged Debtor in connection with the Motion. The requested discovery will advance the interests of the estate and all parties in interest in ascertaining the basis for, and sufficiency of Wells Fargo's request that the Case by dismissed. In anticipation that an objection to this Motion will be asserted, Bankruptcy Rules 7034 and 9014 entitle Wells Fargo to discovery related to the allegations set forth in this Motion.

45. Finally, Wells Fargo requests that this Court set a final evidentiary hearing with respect to the relief sought in this Motion. Given the factual issues raised by this Motion, Wells Fargo submits that an evidentiary hearing may be necessary to provide this Court with an adequate record upon which it can evaluate the Motion. Wells Fargo remains confident that, following such an evidentiary hearing, this Court will determine that the relief sought in this Motion is necessary, required under the Bankruptcy Code and applicable legal precedent, and in the best interests of the Alleged Debtor, its estate, and its creditors.

## **NOTICE**

46. Under the Bankruptcy Rules, a movant must provide at least twenty-one (21) days notice by mail of a hearing "on the dismissal of the case or the conversion of the case to another chapter." Fed.R.Bankr.P. 2002(a)(4). However, given the exigent circumstances, Wells Fargo seeks to shorten that time period and is simultaneously filing a motion to that effect. After this

17

12201103v.8
DEL 86,313,017v1 4-1-10

Court sets a final hearing on this Motion, Wells Fargo shall provide appropriate notice of such hearing under the Bankruptcy Rules.

**WHEREFORE**, Wells Fargo requests that this Court enter an order (i) dismissing the Case and (ii) sanctioning Capstead and its affiliate Redtail pursuant to 11 U.S.C. § 303(i) for the benefit of the Alleged Debtor and (iii) granting such other and further relief as this Court deems just.

Dated: April 1, 2010

GREENBERG TRAURIG, LLP

*[signature]*

Donald J. Detweiler (No. 3087)
Sandra G. M. Selzer (No. 4283)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE 19801
Phone: (302) 661-7000
Facsimile: (302) 661-7360
Email: detweilerd@gtlaw.com
       selzers@gtlaw.com

-and-

SEYFARTH SHAW LLP
Robert W. Dremluk
Mitchell S. Kaplan
620 8th Avenue, 32nd Floor
New York, NY 10018
Phone: (212) 218-5500
Facsimile: (212) 218-5526
Email: rdremluk@seyfarth.com
       mkaplan@seyfarth.com

*Attorneys for Wells Fargo Bank, National Association, as Successor by Merger to Wachovia Bank, National Association, as Special Servicer on behalf of Bank of America, N.A., as Successor by Merger to LaSalle Bank National Association, as Trustee for the Benefit of the Holders of Wachovia Bank Commercial Mortgage Trust Commercial Mortgage Pass-Through Certificates, Series 2007-WHALE 8*