IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Hotel Equity Fund V, LLC,<br><br>               Alleged Debtor. | Chapter 11<br><br>Case No. 10-10951 (BLS)<br><br>**Re: Docket No. 35** |

**RESPONSE OF HOTEL EQUITY FUND V, LLC TO MOTION OF WELLS FARGO BANK, NATIONAL ASSOCIATION, AS SUCCESSOR BY MERGER TO WACHOVIA BANK, NATIONAL ASSOCIATION, AS SPECIAL SERVICER ON BEHALF OF BANK OF AMERICA, N.A., AS SUCCESSOR BY MERGER TO LASALLE BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE BENEFIT OF THE HOLDERS OF WACHOVIA BANK COMMERCIAL MORTGAGE TRUST, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-WHALE 8 FOR AN ORDER (A) DISMISSING THE BANKRUPTCY CASE AND (B) SANCTIONING CAPSTEAD MORTGAGE CORP. AND REDTAIL CAPITAL PARTNERS ONE, LLC PURSUANT TO 11 U.S.C. § 303(i)**

Hotel Equity Fund V, LLC ("HEF"), the putative debtor in this case, by its attorneys, submits this Response to the Motion of Wells Fargo Bank, National Association, as successor by merger to Wachovia Bank, National Association, as special servicer on behalf of Bank of America, N.A., as successor by merger to LaSalle Bank National Association, as trustee for the benefit of the holders of Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2007-WHALE 8 for an Order (A) Dismissing the Bankruptcy Case and (B) Sanctioning Capstead Mortgage Corp. and Redtail Capital Partners One, LLC pursuant to 11 U.S.C. § 303(i), and states:

**SUMMARY OF HEF'S POSITION**

1. HEF is a special purpose Delaware entity formed in 1996 to buy and own the Four Seasons Resort, Nevis (the "Resort"). The Resort consists of 196 guest rooms, a golf course, a spa, restaurants and other related resort amenities. An investment committee makes decisions on behalf of HEF and consists of seven individuals with equal voting rights, including Philip ("Flip") Maritz and Lew Wolff, neither of whom control nor can dictate major decisions for the entity. Numerous individuals have indirect ownership interests in HEF. None of them have any contractual obligation to provide any more funds for the Resort.

2. Maritz, Wolff & Co. ("Maritz Wolff") is the Asset Manager for the Resort. Maritz Wolff has asset-managed the Resort on behalf of HEF on a fee basis since HEF purchased the Resort. Maritz Wolff successfully led the rebuilding and re-opening of the Resort after Hurricane Georges in 1998 and a second time after Hurricane Lenny in 1999. Maritz Wolff, which is controlled by Messrs. Maritz and Wolff, also acts as asset manager for several other investing entities controlled by the same or similar investment committee members, but consisting of different investors. One of the projects that Maritz Wolff is involved in is Little Dix Bay Hotel, a resort in the British Virgin Islands. Additionally, Maritz Wolff is involved in several other resort and urban hotels managed by various management companies, including Rosewood Hotels and Resorts, Four Seasons Hotels & Resorts, Ritz-Carlton and Fairmont Hotels and Resorts. At one time, Maritz Wolff was involved in 20 hotel investments and two hotel management company investments. As a result, Maritz Wolff is an experienced asset manager and investment group associated with properties in the same luxury class of hotels/resorts as the Resort.

3. It should be noted that asset management is very different and distinct from the type of hotel management undertaken by the aforementioned management companies (Four

- 2 -

91004-2100/LEGAL18071695.4

Seasons, Ritz-Carlton, etc.). Asset management involves a company like Maritz Wolff overseeing the management company itself which, pursuant to the Hotel Management Agreement ("HMA"), has operational control over virtually all decisions taken at the property and controls all interaction with guests, suppliers, creditors, homeowners, contractors, government officials, employees and so forth. It is certainly the case at the Resort that Four Seasons, pursuant to the HMA and related agreements, had all such controls described above.

4. In addition to HEF's ownership of the Resort, through another entity that is asset managed by Maritz Wolff, HEF's investors own 42.5% of the villa development company developing the land that is adjacent to and surrounding the golf course at the Resort. This company, F.S.R. Estates Limited ("FSRE"), was not pledged as collateral for the Resort loan. Also, Mr. Maritz individually purchased land, designed and constructed on his own account and continues to own one of the villas developed by FSRE.

5. As a result of the above-described connections to and ownership interests of the Resort and related real estate, Messrs. Maritz and Wolff care deeply for the island of Nevis and its citizens and have been doing everything in their control to persuade those that are in charge, specifically Wachovia Bank, National Association ("Wachovia") and the lender group participants, to make decisions that will ultimately lead to the successful reopening and subsequent successful operation of the Resort for the long term. However, Wachovia has controlled all decisions for the Resort for some time, including all aspects of the rebuilding effort, the insurance settlement and the oversight of the manager, Four Seasons Hotels and Resorts, B.V. ("Four Seasons").

# HISTORY OF THE RESORT SINCE THE LAST REFINANCING
# PRE-HURRICANE OMAR

6.  In 2005, Jones Lang LaSalle was hired to refinance the Resort's debt. The global real property financing market at the time was strong enough that several lenders offered to provide the financing sought on behalf of the Resort. HEF chose Calyon Securities ("Calyon"), previously called Credit Lyonnais, to provide the financing. HEF was very comfortable with Calyon because Calyon had provided the original financing to allow HEF to acquire the Resort in 1996 and had continued as the lender since that date. Consequently, the 2005 refinancing was in many respects a renewal of the original loan made by Calyon in 1996 that had been renewed in 2002. Calyon was obviously satisfied with the Resort's past performance and future projections as well as its physical condition to make the new loan in the new amount.

7.  The refinancing offering memorandum sent to prospective lenders included operating projections and capital renovation requirements that were based on operational analyses prepared by Four Seasons. Calyon also obtained an appraisal by Cushman & Wakefield of Florida, Inc. that indicated a value for the Resort of $166 million as of August 1, 2005, and an anticipated value of $179 million as of August 1, 2007. Clearly, the appraised value of $166 million gave Calyon comfort that the $126,700,000 loan it was making was reasonable. Subsequent to Hurricane Omar, according to Capstead, Cushman & Wakefield valued the Resort on a projected "as restored" basis at $126 million as of July, 2009, indicating that even after the most damaging recession since the Great Depression, the Resort was still worth the amount of the loan. As is customary for hotel financing transactions, the debt was structured as non-recourse, with "springing" guarantees upon certain specified triggering events.

8. HEF used the refinancing proceeds to pay off the original mortgage, to satisfy a loan Four Seasons had made to the Resort of $15 million plus $4.5 million of interest, and to repay an intercompany loan of similar amount and purpose as the Four Seasons loan. HEF received the balance of the proceeds to reserve certain amounts against the possibility of future hurricane-related casualty events and for other business purposes, as described in more detail below. HEF distributed the remainder to its investors as a return of their original equity investment and some profits, as is customary and in the ordinary course in the real estate business.

9. At some point, Calyon sold a portion of the loan to Wachovia, syndicated a portion and retained a portion. Wachovia then securitized the portion of the loan it acquired. Since then, Wachovia has retained no economic interest in the debt, but only retained a role as the master and special servicer of the loan for which it receives a fee.

10. At the time of the 2005 refinancing, business at the Resort was strong, forecasts for future business were positive, and the Resort was in pristine physical condition as a result of the $47 million in improvements that were made to the Resort from 1999 to 2005. These improvements included the construction of a new spa and a new swimming pool, the purchase and redevelopment of a new restaurant, the construction of a new utility plant, and the renovation of guest rooms and public spaces as well as additional improvements paid for outside of insurance proceeds following damage to the Resort caused by Hurricane Lenny in 1999.

11. Indeed, the Resort consistently earned the coveted "AAA Five Diamond" award every year up to and including the year of its closure as a result of Hurricane Omar in 2008. In addition, in 2008 the Resort was on the Zagat "Top 20 Resorts in the World List", ranked #1 in "Mexico/Caribbean for Parents & Kids" by Travel & Leisure Family Magazine, "Best Hotel Spa

in Caribbean" by Travel & Leisure Magazine, and "Platinum List for Top Caribbean Hotels," by Celebrated Living Magazine, among other accolades.

12. As part of the loan agreement, Calyon requested and HEF agreed to the creation of several hold backs to reserve against future events and for future resort capital requirements Specifically, (1) $4.8 million was left in a "wind reserve" account to cover insurance deductibles, which HEF later increased to $5 million; (2) $3,450,000 was left in a debt service reserve account to cover working capital and debt service shortfalls; (3) $1,556,000 was left in a capital reserve account for future Resort improvements and repairs; and (4) $818,000 was left in a reserve account to cover the 2006-2007 premium renewal for political risk insurance. These were substantial hold backs not commonly required by Lenders or agreed to by borrowers at the time, and illustrate the conservative approach taken by Calyon and HEF in the underwriting of the loan.

13. Calyon required no other hold backs for the Resort at that time (nor did Wachovia subsequently request any) and was well aware that proceeds from its loan would be distributed to HEF's investors. In fact, such payment was clearly designated on the refinancing closing statement. For its part as manager of the Resort, Four Seasons did not seek a hold back of any of the refinancing proceeds, neither for future repairs, renovations or improvements, or for any other reason, and lodged no objection when advised of HEF's plan to distribute a portion of the proceeds to its investors.

14. Since distributing the refinancing proceeds in October 2005 and January 2006, HEF has made no distributions to its investors. On the other hand, since the 2005 refinancing and until Hurricane Omar in 2008, approximately $11 million of Resort cash has been used to pay Four Seasons' management, royalty and marketing fees under its long-term management

- 6 -

91004-2100/LEGAL18071695.4

contract. These fees are in addition to the $19.5 million in loan proceeds Four Seasons received to repay its $15 million loan plus interest.

15. Shortly after the refinancing occurred, the profitability of the Resort under Four Seasons' management started to deteriorate significantly. For instance, in 2006, gross revenues declined slightly more than $1 million from 2005, but net operating income ("NOI") – profit before debt service – dropped more than $3.5 million. The substantially greater drop in profits compared to the drop in gross revenues proved a harbinger of Four Seasons' deteriorating management in subsequent years. By the time of Hurricane Omar in October 2008, NOI was projected to be $5.1 million for the year, or only 43% of the NOI in 2005 (a drop of $6.7 million in profits), even though business levels and revenue had dropped only $2 million over this time period. The decline in the Resort's profits was a direct result of Four Seasons' deficient management of fundamental operating components of the Resort, including revenue management, villa rentals, cost control management, preventative maintenance, fixed asset protection, energy management, cash management, labor forecasting and management, forecasting/budgeting accuracy and hiring practices.

16. On February 1, 2007, Maritz Wolff organized a summit meeting with key Four Seasons corporate personnel to highlight and try to correct Four Seasons' management deficiencies. Although Maritz Wolff was not responsible for day-to-day Resort management, it felt a dire need to organize this meeting to discuss, among other issues, inadequate systems and work processes at the Resort, including the lack of (i) room occupancy and rate (yield) management systems (such systems are quite common and had been used by most hotel management companies for years), (ii) an environmental/green program, (iii) an energy conservation program, (iv) a preventative maintenance program, (v) an adequate villa rental

- 7 -

91004-2100/LEGAL18071695.4

program, (vi) an effective labor management system, (vii) a system to control costs and (viii) an effective general manager.  Four Seasons, pursuant to the Hotel Management Agreement and related agreements, was unilaterally responsible for all of these aspects of the operations of the Resort in its highly paid role as Resort manager.  The only progress made from the meeting was the replacement of the general manager.  Unfortunately, the replacement general manager (the current general manager of the Resort) has also proved ineffective.

17. As 2007 proceeded with Four Seasons failing to improve its management of the Resort, Four Seasons presented a startling Resort budget for 2008.  Astoundingly (especially in light of the poor actual and projected financial performance of the Resort), the budget included the reclassification of more than $6 million in employee service charges into revenue.  These charges essentially were tips charged to guests and paid out to employees.  Basically, Four Seasons claimed that after 17 years of operating the Resort, it came to the sudden and specious realization that it had supposedly been interpreting its own Hotel Management Agreement incorrectly with respect to the manner in which it had been accounting for the collection and payment of these service charges for all those years.  This self-serving accounting change effectively increased Four Seasons' management, royalty and marketing fees – which are calculated as a percentage of gross revenues – by about $400,000 in 2008 and in each subsequent year thereafter even though Four Seasons performed no additional services.  Taking into account other charges tied to revenue, this practice would effectively reduce the value (using the methodology employed by the appraisers) of the resort by $6 million to $10 million.  After unsuccessfully trying to dissuade Four Seasons from implementing this change, HEF was forced to take legal action against Four Seasons.  The arbitration of this claim was stayed when the

lender group took over the rebuilding and insurance claim for the Resort in 2009 and refused to release funds to pay for the legal work.

18. Despite all of these problems, Maritz Wolff continued to work with Four Seasons on formulating and implementing capital improvement plans in 2007 and 2008 in an effort to make progress on the issues it raised in the February 2007 meeting. In fact, from 2006 to 2008, more than $7.7 million of capital improvements were made to the Resort. Notwithstanding this level of capital improvements, Four Seasons began to blame all the Resort's problems on what it now claims was the Resort's insufficient physical condition needing immediate and very costly improvement. Maritz Wolff considered this contention incredible in light of the previously mentioned ratings by third-party assessors and the Resort's standing in various surveys of resorts in the Caribbean. Moreover, Four Seasons' statements were belied by its actions. For instance, Maritz Wolff and Four Seasons worked together to prepare a renovation for the guest rooms in 2008. After spending months and substantial dollars on finalizing the plan and specifications with an interior design firm, Four Seasons unilaterally canceled the project in early 2008 and noted that it thought the planned renovation could be deferred to a later date, indicating a belief that the condition of the guest rooms was satisfactory.

19. At the same time, beginning in early 2008, HEF was engaged in active negotiations with Ashford Financial Corporation ("Ashford"), controlling loan holder for the lender group at the time, to extend the loan in anticipation of defaults under loan extension covenants scheduled to be triggered in October 2008. In fact, HEF was close to finalizing terms of an extension when the Resort was struck by Hurricane Omar.

20. On September 5, 2008, at the same time that HEF was negotiating an extension of its loan, Four Seasons notified HEF that due to alleged insufficient cash levels at the Resort, Four

- 9 -

91004-2100/LEGAL18071695.4

Seasons would not make the debt service payment to Wachovia (as was always its customary practice in the past) due on September 8, 2008.  After reviewing this issue in detail, HEF discovered that there was more than sufficient cash to make the payment, and questioned Four Seasons on its transparent attempt to put HEF in default of its loan.  Four Seasons responded by claiming that a default would be advantageous for HEF in negotiations to extend and modify the loan agreement.  HEF vehemently disagreed with the notion of not paying the debt service.  After a heated debate, Four Seasons finally agreed to make the September 8 debt service payment with cash available at the Resort.  It was this experience – combined with Four Seasons' prior cash projections that varied widely from reality – that caused HEF and Maritz Wolff to question every subsequent cash request by Four Seasons.

## POST-HURRICANE OMAR

21. A deteriorating financial situation at the Resort became more challenging when Hurricane Omar damaged the Resort and forced it to close on October 15, 2008. Immediately following Hurricane Omar and the Resort's closure, Four Seasons claimed that it had to repay approximately $9.4 million in advance deposits it had received for future reservations from Resort guests.  These advance deposits should have been in Resort accounts controlled by Four Seasons, but Four Seasons must have used them in operations.  Four Seasons demanded that HEF immediately provide the funds to cover the refund of these advance deposits even though some related to reservations several years in the future when the Resort, by any reasonable forecast, should have been reopened.  However, based on past experience, there were substantial concerns regarding Four Seasons' contentions, particularly relating to accurate accounting.  It also appeared that Four Seasons had a motivation to repay these deposits promptly to preserve its own reputation rather than provide appropriate advice to HEF as Four Seasons was required to do in its role as HEF's agent and fiduciary.  Additionally, these advance deposits should have

- 10 -

91004-2100/LEGAL18071695.4

been covered by the business interruption insurance that HEF had been fully funding for many years. Nevertheless, Four Seasons acted on its own to protect its reputation by apparently refunding the advance deposits out of its own funds without HEF's knowledge or approval and without providing any documentation to HEF. Four Seasons then tried to hold up the first advance of insurance proceeds for the reconstruction of the Resort by refusing to agree to the distribution unless Four Seasons was repaid for the advance deposits it had unilaterally refunded. Finally, in December, 2008, Four Seasons relented and signed off on the first advance of $10 million of insurance proceeds.

22. After Four Seasons repaid the advance deposits, despite its continued role as HEF's agent, it began to act unilaterally and make decisions either without ownership input or contrary to ownership's direction. Additionally, it began referring creditor inquiries directly to HEF, effectively abandoning part of its management responsibilities. To make matters worse, Maritz Wolff began to receive increasingly threatening letters and emails from board members of the Four Seasons Resort Estates Homeowners Association Limited (the "HOA"). These communications included information about HEF's loan terms and the Resort's financial results that only Four Seasons could have disclosed to the HOA, in violation of its obligations to HEF. These communications also indicated that Four Seasons, without Maritz Wolff's knowledge or ever seeking HEF's approval, had presented a capital plan for the Resort directly to the HOA. Based on these communications, the HOA suddenly was unhappy with the condition of the Resort prior to Hurricane Omar, and insisted that significant capital improvements above the insurance proceeds would be necessary for them to "support" the re-building and re-opening of the Resort. This message was the same that Four Seasons had started to use as an excuse for the

Resort's poor financial performance and had never been expressed by the HOA prior to the Resort's closure.

23. Maritz Wolff attempted to work with HOA board members on a collaborative approach through face-to-face meetings and correspondence, but Four Seasons continued to disparage Messrs. Maritz and Wolff, and sent alarming letters to the villa owners (for instance, falsely representing that HEF would no longer provide utilities through the Resort and advising villa owners to seek power directly from the utility company). This ultimately led the HOA to take its unwarranted legal action against HEF, Maritz Wolff and others.

24. Maritz Wolff, on behalf of HEF, initially led the insurance claims handling and Resort rebuilding process. To that end, Maritz Wolff successfully convinced the insurers to fund two advances totaling $22.5 million for the rebuilding effort and obtained signatures from all named insureds on the two distributions. Four Seasons again tried to hold up the second draw of $12.5 million unless it was repaid for the advance deposits it paid, but ultimately again relented.

25. At the same time, HEF continued its negotiations with Ashford on a loan extension and a plan for rebuilding the Resort. As Maritz Wolff was working in good faith in these efforts, Ashford indicated that insurance funds would be released to HEF to cover Maritz Wolff's time and effort in the rebuilding and insurance claims handling. Wachovia later contended that payment of Maritz Wolff's fees was tied to a successful extension and modification of the loan agreement with HEF. Wachovia now maintains that these fees are not covered by insurance at all and that Maritz Wolff should receive nothing for its work. Maritz Wolff continues to disagree with Wachovia and is actively seeking its fully supported claims. Although Wachovia contends that this dispute over payment of Maritz Wolff's fees was the reason why the insurers did not fund the third advance totaling $8.9 million, there were a number

of unrelated issues holding up this funding of additional insurance proceeds, including Four Seasons' claims. Despite this dispute, Maritz Wolff continues to do substantial work on behalf of HEF without being paid fees since Hurricane Omar.

26. Following the first two insurance advances totaling $22.5 million, no other insurance advances have been made relating to the Resort. In order to fund rebuilding efforts, Wachovia has allegedly used its protective advance facility to fund almost $30 million in repairs and business interruption expenses. Wachovia has made these advances even though ownership of the Resort remains with HEF.

27. In January, 2009, Maritz Wolff, on HEF's behalf, held meetings in New York City with key constituents, such as FSRE, the HOA, Nevis government officials and Four Seasons senior management to lay out the issues and a plan to rebuild and reopen the Resort. However, soon after the meeting, it became clear that Four Seasons was undermining HEF's reputation with the HOA and the Nevis government and the possibility of reaching a consensus was remote.

28. Subsequently, HEF's negotiations with Ashford broke down due partly to Ashford's refusal to allow HEF as part of the loan extension to use Resort cash to fund a lawsuit against Four Seasons for a large list of breaches only briefly described in this Response, even though the lender group would receive the benefit of any damages. HEF offered to tender a deed in lieu of foreclosure, but Ashford indicated the lender group was unable to accept it due to complications stemming from certain aspects of Nevis law. At the same time, Wachovia notified HEF of its desire to take over the rebuilding and insurance claims process. HEF acquiesced although it continued to cooperate with the rebuilding process.

29. On or about December 19, 2008, Wachovia initiated foreclosure-like proceedings in Nevis. HEF did not object or in any way act to impede that proceeding. For its part, Maritz

- 13 -

91004-2100/LEGAL18071695.4

Wolff continued administrative, accounting, reporting and other asset management work on behalf of HEF, such as engaging various vendors in the claims preparation and reconstruction process.

30. In September, 2009, Redtail Capital Partners One, LLC ("Redtail") became the controlling holder for the lender group. Upon assuming the controlling holder position, Redtail contacted Maritz Wolff, on behalf of HEF, to discuss all options. Redtail indicated that the goal should be a credible plan to rebuild and reopen the Resort that would produce the highest possible net present value ("NPV"). Maritz Wolff agreed to craft this plan and believed that Wachovia, as loan servicer, would agree to it because loan servicing standards generally require the special servicer to act in a manner that is intended to achieve the highest NPV for its collateral. Together, a pre-planned bankruptcy and reorganization plan was developed, which included rejecting Four Seasons' HMA and related agreements in an effort to create a viable, long-term Resort operation. The plan under development would have benefited the lender group and provided the most likely avenue to maximize repayment of HEF's loan in addition to creating the highest NPV for the Resort.

31. As a result, Redtail agreed as part of the plan that the lending group would fund the bankruptcy and Resort redevelopment using insurance proceeds, Wachovia's protective advance facility, and the $5 million remaining in the wind reserve controlled by Wachovia. HEF's investment committee approved the plan. Capstead Mortgage Corporation ("Capstead"), which HEF believed to be Redtail's parent company, agreed to fund HEF's professional fee retainers to allow HEF to prepare for the bankruptcy filing. HEF believes this payment of retainers forms the basis of Capstead's claim as a petitioning creditor. Such funding was not a loan to HEF, but rather an undertaking by Capstead to fund the costs of HEF's professional fees

to initiate a bankruptcy case. Contrary to Wachovia's uninformed assertion in its Motion to Dismiss, HEF did not engage in an unauthorized transaction under its loan agreement with the lender group or violate its Operating Agreement. Indeed, HEF was led to believe that the lender group fully supported the bankruptcy based on discussions with Redtail as the controlling holder and due to its knowledge regarding the special servicer's obligation to support the plan that created the highest NPV.

32. HEF was almost entirely prepared to file its pre-planned Chapter 11 in mid-December, 2009, awaiting just a DIP financing agreement among a few other items from the lender group. Then, abruptly, on December 18, 2009, HEF was notified that as a result of a new appraisal commissioned by Wachovia, Calyon New York Branch ("Calyon") had replaced Redtail as the controlling holder for the lender group as of December 11, 2009.

33. Upon assuming the controlling holder position, Calyon, together with Wachovia, contacted Maritz Wolff, on behalf of HEF, to discuss all options. Upon request by Calyon and Wachovia, Maritz Wolff presented the reorganization plan developed with Redtail. In a subsequent call in January 2010 with Wachovia and Calyon, Wachovia indicated that while the bankruptcy option would be considered, there would not be any excess insurance proceeds or wind reserve monies available to fund the bankruptcy and Wachovia would not make available its protective advance facility for that purpose. Calyon agreed to explore the options further and make a decision at a later date once it had a chance to visit the Resort, which it did in early February, 2010. Shortly thereafter, on March 3, 2010, Calyon contacted Maritz Wolff and shared that the lender group would be proceeding with the foreclosure because Wachovia was only willing to fund redevelopment and working capital shortfalls in the context of a foreclosure,

not under a bankruptcy. A foreclosure sale of the Resort was soon set for March 25, 2010. Once again, HEF took no steps to impede the foreclosure process.

## PENDING LAWSUITS RELATED TO THE RESORT

34. On or about October 16, 2009, the HOA sued HEF and Maritz Wolff (and later added Wachovia and others as defendants) for fraudulent conveyance of refinancing proceeds, actions taken by Maritz Wolff (allegedly HEF's "alter ego") to strip the Resort of capital, failure to maintain the Resort to five-star standards, failure to insure the villa owner's portion of lost rental revenue and various other breaches related to the contract governing HEF's obligation to service the Resort villas. Tellingly, Four Seasons was not named as a defendant even though it bore the responsibility for much of what the HOA complained about in its suit, particularly as it related to maintenance of the Resort and the servicing of the villas.

35. HEF believes all of the HOA's claims are without merit and that this suit is nothing more than an attempt by the HOA to gain a role in the insurance settlement process in hopes that the villa owners can collect insurance proceeds for their lost rental revenue on their villas during the Resort's closure. Maritz Wolff and Wachovia have both on separate occasions confirmed with the insurers that the HOA rental revenue is not covered because the property insurance policy is for the benefit of the Resort and HEF as its owner. HEF has never insured the villa owners' share of rental revenue. The scope of insurance coverage has remained the same at least when HEF purchased the Resort in 1996. Neither Four Seasons nor the villa owners have ever raised any objections that the insurance coverage was lacking (not after Hurricane Lenny and not after Hurricane Georges) until after the Resort closure caused by Hurricane Omar. Indeed, no villa owner has ever requested insurance coverage through HEF, nor has any villa owner ever been asked to pay for any insurance coverage provided by HEF. Each villa owner is responsible for insuring his or her own dwelling. Thus, they can insure

against an interruption in their share of villa rental revenues if they so choose in their own individual policies.

36. HEF suspects that Four Seasons encouraged the HOA's claims in an attempt to force HEF out as owner of the Resort and allow Four Seasons to retain its lucrative fees for managing the Resort and because two other Maritz Wolff asset managed hotels were engaged in litigation with Four Seasons. As evidence, numerous requests by Maritz Wolff for Four Seasons to provide documents and other evidence supporting HEF's defense have gone unanswered. Moreover, Four Seasons unilaterally reduced the 2009 and 2010 annual villa assessments that it charges the villa owners on behalf of HEF without HEF's approval, which has effectively allowed the HOA to fund its suit against HEF. If the HOA and Four Seasons were not acting cooperatively, HEF suspects that Four Seasons would be a defendant as most of the HOA's claims relate to alleged actions or inactions for which Four Seasons is responsible in the day-to-day operation and servicing of the villas.

37. When Maritz Wolff was still involved in the claims management and rebuilding effort of the Resort, it successfully persuaded the insurers to advance $22.5 million for the rebuilding effort. In the absence of an agreement between Wachovia, Maritz Wolff, HEF, and Four Seasons on how the additional insurance proceeds should be allocated among them, the group has not been able to complete documentation for the release of additional insurance advances totaling approximately $20 million from the insurers. As a result, on March 8, 2010, the insurers filed an interpleader action in federal court in Delaware to deposit these funds into court and have the court decide on how they should be allocated among the insureds, including HEF. Maritz Wolff has claimed $1,214,761 in fees and expenses as a named insured. Contrary to Wachovia's suggestion in its Motion to Dismiss, Maritz Wolff seeks only what it is owed and

91004-2100/LEGAL18071695.4

is not responsible for any delay in the distribution of insurance proceeds by the insurers. Indeed, at this point, Wachovia has taken the position that Maritz Wolff's consent is no longer required as the funds have been paid into the court.

38. On March 19, 2010, Wachovia filed an action in Missouri state court against various insurers for breach of contract in connection with their alleged failure to fund insurance claims related to the damage at the Resort caused by Hurricane Omar. Although HEF is not a party to such action, the subject of that proceeding directly relates to HEF's property interest in the Resort and its outcome may impact the reconstruction process.

## FILING OF THE INVOLUNTARY PETITION

39. On March 19, 2010, Capstead and two other alleged creditors filed an involuntary petition for relief under Chapter 11 against HEF. HEF did not solicit such a filing or cause such petition to be filed. Neither HEF nor Maritz Wolff had contact with any of the alleged creditors (except for prior communications with Capstead) regarding their plans to make a bankruptcy filing. The HOA's speculation in its response to the involuntary petition that Mr. Maritz had discussions with several of the petitioners about the filing of the petition is flat wrong.

40. Soon after the filing, Four Seasons filed a motion to pay certain pre-petition claims, including payroll and crucial trade vendors. Four Seasons did not consult with HEF prior to filing that motion or in any way seek HEF's cooperation in its filing. Nonetheless, HEF did not oppose that motion after it was subsequently resolved to omit numerous unwarranted payments to Four Seasons, its related entities and non-Nevisian employees.

41. On March 26, 2010, Wachovia sent a letter to HEF demanding that it consent to the restoration of the Resort and provide funding for it notwithstanding that Wachovia had been funding the repairs with its own protective advance facility for months. HEF responded that it consented to the restoration and would cooperate with Wachovia in pursuing an appropriate

Court order to provide it with some comfort should it desire to continue to fund such efforts. Wachovia has not taken HEF up on its offer to provide assistance in obtaining such an order.

## CONCLUSION

42. HEF obviously believed that a pre-planned Chapter 11 proceeding as previously described was in its best interests, in the best interests of its creditors and in the long-term best interests of the Resort and the people of Nevis. By rejecting the Four Seasons' HMA, the project would be unburdened by a contract lasting up to 67 more years at above-market terms costing the Resort approximately 10% of its gross revenues every year, which is roughly twice the current market rate. This rejection of the HMA alone could increase the value of the Resort by many millions of dollars. It would also relieve the Resort of a deficient and adversarial manager and prevent a repeat of what happened at the Four Seasons Resort in Exuma, Bahamas, a similar asset that ultimately was closed (even in the absence of a casualty event such as a hurricane) and sold at a deep discount to a lower tier operator, causing enormous losses to creditors. Rejection of the HMA would provide an opportunity for a much more capable and efficient management company to take over villa operations and services, and thus make the annual dues and assessments charged to villa owners more reasonable. Moreover, HEF believes that its claims against Four Seasons for mismanagement will far outweigh any potential contract rejection claims of Four Seasons. Bankruptcy also would provide a single forum to resolve the interpleader and breach of contract actions. Nevertheless, HEF recognizes the importance of the lender group's support with respect to any restructuring in a Chapter 11 context and believes it may only make sense for this case to continue in bankruptcy with that support.

43. In sum, if the Court decides not to dismiss this case, HEF is prepared to proceed as a debtor-in-possession with appropriate support from the lender group with the goal to re-open the Resort as soon as possible in a manner that is sustainable for the long term, which is in the

- 19 -

91004-2100/LEGAL18071695.4

best interests of all the various interested parties. If the Court decides to dismiss this case, it is not HEF's present intent to stand in the way of the foreclosure of the Resort, just as it has not stood in the way in the past.

Dated: April 20, 2010

Respectfully submitted,

**POLSINELLI SHUGHART PC**

*/s/ Christopher A. Ward*
Christopher A. Ward (Del. Bar No. 3877)
Justin K. Edelson (Del. Bar No. 5002)
Shanti M. Katona (Del. Bar No. 5352)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
(302) 252-0920 (Telephone)
(302) 252-0921 (Facsimile)
cward@polsinelli.com
jedelson@polsinelli.com
skatona@polsinelli.com

- and -

David M. Neff, Esquire
PERKINS COIE LLP
131 S. Dearborn Street, Suite 1700
Chicago, IL 60603-5559
Telephone:312.324.8400
Facsimile: 312.324.9400

*Counsel to Hotel Equity Fund V, LLC, Alleged Debtor*