IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| Hotel Equity Fund V, LLC, | ) ) ) | Case No. 10-10951 (BLS) |
| Alleged Debtor. | ) ) ) | Re: Docket No. 35 |

## REPLY OF FOUR SEASONS IN SUPPORT OF WELLS FARGO'S MOTION TO DISMISS

On April 1, 2010, Wells Fargo Bank, National Association ("Wells Fargo") filed a motion seeking an order dismissing this bankruptcy case pursuant to 11 U.S.C. § 1112(b) (the "Motion") [Docket No. 35].[1] The only parties that have opposed the Motion are Capstead Mortgage Corp. ("Capstead") and Redtail Capital Partners One, LLC ("Redtail"). The other two petitioning creditors, Berglund Architects, LLC and Island Water World, have not filed objections to the Motion. Nor has the Alleged Debtor, Hotel Equity Fund V, LLC ("HEF"), which filed a response that (i) takes no position on the Motion, (ii) recognizes "the importance of the lender group's support for any restructuring," and (iii) concludes that "it may only make sense for this case to continue in bankruptcy with that support."[2] (HEF Response, ¶ 42.)

---

[1] The full title of the Motion is as follows: Motion of Wells Fargo Bank, National Association, As Successor by Merger to Wachovia Bank, National Association, as Special Servicer on Behalf of Bank of America, N.A., as Successor by Merger to Lasalle Bank National Association, as Trustee for the Benefit of the Holders of Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2007-Whale 8 for an Order (A) Dismissing the Bankruptcy Case and (B) Sanctioning Capstead Mortgage Corp. and Redtail Capital Partners One, LLC Pursuant to 11 U.S.C. § 303(i).

[2] Four Seasons (as defined below) will refer to the objection to the Motion filed by Capstead and Redtail [Docket No. 79] as the "Capstead/Redtail Objection" or simply the "Objection." Four Seasons will refer to the response to the Motion filed by HEF [Docket No. 75] as the "HEF Response," or simply the "Response."

- 1 -

DEL1 74881-1

Four Seasons Hotels and Resorts B.V. ("Four Seasons"), the operator of the Four Seasons Resort Nevis (the "Hotel"), submits this reply in support of the Motion (the "Reply").[3] Four Seasons wishes to emphasize several reasons why the Motion should be granted, and to respond to false allegations against Four Seasons raised for the first time in the Capstead/Redtail Objection and the HEF Response. In support of this Reply, Four Seasons, by and through its undersigned attorneys, respectfully represents as follows:

## PRELIMINARY STATEMENT

1. Since HEF abandoned the Hotel in February 2009, Wells Fargo, as Special Servicer, has been pursuing a plan to restore the Hotel to the world-class luxury resort it was before Hurricane Omar. The plan has involved (i) pursuing insurance coverage for the hurricane damage; (ii) reconstructing the property using insurance proceeds and supplemental advances from Wells Fargo; and (iii) foreclosing on the property in light of HEF's loan default and its unwillingness to contribute funds to the Hotel. The plan also calls for Four Seasons to remain in place as Hotel operator — which is not surprising, given the superb results the Hotel has achieved under Four Seasons' management and the contractual commitments made by both HEF and the lenders to allow Four Seasons to operate the Hotel for the term of its hotel management agreement ("HMA")[4] and not to disturb Four Seasons' rights as operator in the event of a sale, loan default, foreclosure, or otherwise.

2. This effort has the support of the five stakeholders with arguably the greatest interest in the Hotel: (i) Wells Fargo, as Special Servicer; (ii) Calyon, currently the Controlling Lender; (iii) the villa owners, who have an enormous financial stake in retaining the Four

---

[3] Four Seasons submits this Reply on its own behalf and not as an agent of HEF.
[4] The applicable contract is the Amended and Restated Hotel Management Agreement dated November 19, 1996, as amended. A true and correct copy is attached as Exhibit A to the Declaration of Andrew Humphries in Support of the Emergency Motion of Four Seasons [Docket No. 7].

- 2 -

DEL1 74881-1

Seasons flag; (iv) the Government of Nevis, which is seeking to protect the overall economy of Nevis and the economic wellbeing of its citizens; and (iv) Four Seasons. It is opposed, however, by Redtail — a disgruntled subordinated lender that lost its position as Controlling Lender late last year. Redtail and its parent Capstead (together, "Redtail/Capstead") have joined with HEF's asset manager, Maritz Wolff, to devise an alternative scheme that would reinstate Redtail as Controlling Lender, replace Wells Fargo as Special Servicer, terminate the HMA with Four Seasons, and award a new management agreement to an company controlled by Maritz Wolff. This scheme has only now been revealed to Four Seasons.

3. As they devised this scheme last fall, Redtail/Capstead and Maritz Wolff recognized that the HMA could not be terminated without incurring very significant liability for breach of contract (under both the HMA and a parallel non-disturbance agreement) and claims against Capstead and Maritz Wolff for tortious interference. In an attempt to insulate themselves from such liability, they planned to initiate a bankruptcy proceeding for the purpose of "rejecting" the Four Seasons contract. But Redtail, Maritz Wolff, and HEF were all subject to various contractual obligations that either barred the commencement of a bankruptcy proceeding or imposed significant financial consequences for filing one. So Capstead – which had no interest in the Hotel except as Redtail's parent – became the petitioner in support of the Redtail-Maritz Wolff scheme. Capstead conjured up a phony "loan" to HEF — which HEF in its Response denies the existence of — and then traveled to Nevis to find other creditors to join its filing, "generously" handing out $100 bills in the process.

4. It is hard to imagine stronger indicia of bad faith. For the reasons set forth in the Motion and further explained herein, the conduct of Redtail/Capstead supports dismissal. In their Objection, Redtail/Capstead offer little to justify their conduct. Instead, in an effort to find

- 3 -

DEL1 74881-1

scapegoats, they spend most of their brief attacking Wells Fargo and Four Seasons and arguing why those parties should be ousted. As shown in detail below, the charges against Four Seasons are patently false. More importantly, in the context of the Motion, these charges are largely a sideshow designed to distract attention from the bad faith conduct at issue.

5. Redtail/Capstead and Maritz Wolff have orchestrated this bankruptcy proceeding to advance their own narrow interests — not to enhance the value of the estate for the benefit of all creditors. Redtail/Capstead hopes to prevent a foreclosure and gain leverage against the other lenders. Maritz Wolff hopes to use HEF's bankruptcy to further its self-dealing plan to replace Four Seasons with an operator it controls. And Redtail/Capstead, Maritz Wolff, and HEF all hope to pursue in this proceeding an end they could not otherwise achieve: termination of the HMA.

6. While their plan would enrich Redtail and Maritz Wolff, it would not improve the value or profitability of the Hotel, HEF's only asset. To the contrary, it would impose on the estate enormous liability for breaching the HMA, further diluting any recovery to the Hotel's other creditors, whose claims would be extinguished. Moreover, this plan has no realistic chance of acceptance given the opposition of Wells Fargo, Calyon, the villa owners, the Government of Nevis, and Four Seasons — whose consent would be required in order to consummate any plan of reorganization.

7. To permit this bankruptcy proceeding to drag along without a reasonable prospect of a successful reorganization only serves to delay the reopening of the Hotel, drive down the value of the asset further, and possibly lead to the Hotel's permanent closure — resulting in a loss of hundreds of jobs and potentially causing irreparable harm to the Nevis economy. Given

these dire consequences, and the bad faith motives demonstrated by Redtail/Capstead in initiating these proceedings, the Court should exercise its discretion to dismiss this case.

## FACTUAL BACKGROUND

### A. Four Seasons and the Nevis Hotel

8. Four Seasons is widely recognized as one of the premier luxury hotel operators in the world. Its 84 hotels and resorts are known for first-class luxury accommodations, in distinctive and elegant settings, with impeccable personalized service. In Travel + Leisure's January 2010 ranking of the world's best hotels, Four Seasons had 40 properties on the list. Last year, Condé Nast Traveler ranked Four Seasons the # 1 hotel chain in the United States and the # 2 hotel chain in the world. The Gallivanter's Guide, published in the United Kingdom, last year named Four Seasons the best hotel group in the world.

9. The Hotel is operated by Four Seasons pursuant to the terms of the HMA. Four Seasons entered into the agreement to manage the Hotel in 1989; HEF assumed this contract (as amended and restated) when it bought the Hotel in 1996. As is common in the hospitality industry, the HMA is a long-term contract. It runs through December 31, 2021, and, at Four Seasons' option, may be extended for up to 55 additional years. The HMA contains performance standards for Four Seasons and specific provisions governing termination, as well as a dispute resolution process to resolve differences between the parties.

10. In 2005, HEF refinanced the Hotel and encumbered the Hotel with a mortgage loan in the original principal amount of $126,700,000 (the "Loan"). The Loan was initially made by Calyon, part of Credit Agricole ("Calyon"), and subsequently divided into six participation interests held by Bank of America, as trustee on behalf of certain certificate holders, Calyon, Redtail, and Ashford Hospitality Finance LP. (See Motion, ¶ 6.) Wells Fargo acts as Special Servicer for the Loan.

11. As required by the HMA, in connection with the Loan, HEF and Calyon signed a Non-Disturbance Agreement (the "NDA") in which they agreed that Four Seasons' right to operate the Hotel under the HMA would not be disturbed and that Four Seasons would remain operator in the event of a sale, loan default, foreclosure, or any "other exercise of Lender's remedies under the Mortgage." (Exhibit A, at § 1.) By virtue of the participation agreement among the lenders (the "Participation Agreement"), the NDA is binding on all the lenders, including Redtail.

12. Under the management of Four Seasons, the Hotel became one of the finest resorts in North America. In 1992, it became the first resort in the Caribbean to achieve the coveted AAA Five Diamond Award, and it has retained that status every year since. In its 2007/2008 list, Zagat named the Hotel one of the top 20 in the world. In both 2007 and 2008, the Hotel was ranked in the Condé Nast Traveler Readers' Poll as the #1 spa in the Caribbean.

13. Adjacent to the Hotel are approximately 65 privately owned luxury villas (the "Villas") that are operated together with the Hotel under a series of contracts between HEF and the villa owners. Four Seasons, as agent for HEF and pursuant to the HMA, provides the villa owners with housekeeping, security, landscaping, concierge, and other services, and maintains Hotel facilities such as swimming pools, spa, and health club for their use.

**B.    The Hurricane and HEF's Loan Default**

14. On October 9, 2008, HEF defaulted on the Loan. One week later, the Hotel was closed as a result of serious damage caused by Hurricane Omar. For several months following the hurricane, Four Seasons worked closely and cooperatively with HEF and the lenders to move towards rebuilding and reopening the hotel.

15. But HEF soon lost interest. It refused to provide any funds for the rebuilding effort. It ignored requests made by Four Seasons under the HMA for working capital to fund ongoing operations. And on February 9, 2009, in response to correspondence from Simon Lowe, president of the villa owners association, HEF's asset manager Maritz Wolff wrote a letter announcing to the lenders, the villa owners, and Four Seasons that HEF was withdrawing from the operation of the Hotel:

> We have therefore concluded that we alone among the stakeholders addressed in this letter are not in step with the others and thus *it is in everyone's best interest that we follow Mr. Lowe's advice and "offer to step aside"*. . . .
> And while we cannot direct the Lender as to whom they should allow or assign to "take over", what we can and have now done as of yesterday, February 9, 2009, is propose to the Lender that HEF V [*i.e.*, HEF] voluntarily give a deed in lieu of foreclosure to the benefit of the Lender *or otherwise cooperate with the Lender in a manner that suits them.* This should, if the Lender agrees, allow Mr. Lowe and Four Seasons to take over and, as Mr. Lowe wrote, "restore the Resort to its "world class resort" status" . . . .
> [W]e wish you all great success . . . .

(Exhibit B (emphasis added).)

16. Thereafter, with HEF's express consent, Four Seasons began working with the lenders directly, with little involvement from HEF or its asset manager Maritz Wolff, on both the reconstruction efforts and ongoing Hotel operations. From February 2009 onward, operational decisions regarding the Hotel were made with the knowledge and approval of the lenders.

17. Following Hurricane Omar, with the exception of certain assessments paid by the villa owners, funds for Hotel operations have come from Wells Fargo, either as protective advances made by Wells Fargo or releases of insurer advances. Before Wells Fargo would deposit any amounts into Hotel bank accounts for payment of expenses, Four Seasons was required to submit a draw request, signed by officers, listing the amounts to be paid. As a result,

Wells Fargo, acting on behalf of the lenders, has signed off on every payment made by Four Seasons since the hurricane, including the salaries paid to each employee.

18. Notwithstanding the close oversight by HEF prior to February 2009 and by the lenders thereafter, both Redtail/Capstead and HEF complain about performance issues and accuse Four Seasons of mismanagement. These charges are, quite simply, fictitious. At the hearing on May 5, Four Seasons will be prepared to rebut these allegations in full. For now, we address just a few examples:

(a) Redtail/Capstead criticizes Four Seasons for "unnecessary and unexplained costs since the closing of the Property . . . include[ing] the maintenance of a staff of 272 full-time employees . . . ." (Redtail/Capstead Response, ¶ 50.) But the truth is that both HEF and the lenders participated in the layoff decisions made following the hurricane in which over 600 workers were laid off but agreed that workers should be kept on staff to provide basic security and maintenance, service the Villas, and support the reconstruction. With each subsequent payroll date, the lenders have ratified these decisions by providing the funds necessary to pay these workers. Prior to the recent briefing, neither the lenders nor HEF had ever objected to the number of employees retained following the hurricane.

(b) Redtail/Capstead also complain about the use of funds to reimburse Four Seasons for the salaries of sales representatives dedicated to the Hotel and working out of a New York sales office. (Redtail/Capstead Response, ¶ 50.) These employees are the Hotel's only sales staff and are necessary to maintain a pipeline of business. Moreover, the lenders supported the decision to retain staff at the New York sales office, and have

consistently approved the draw requests submitted by Four Seasons for the rent and salary charges.

(c) In a portion of the HEF Response that can only be read as fiction, HEF complains about Four Seasons' decision to return to Hotel guests $9.4 million in advance deposits for future stays. HEF writes:

> These advance deposits should have been in Resort accounts controlled by Four Seasons, but Four Seasons must have used them in operations. Four Seasons demanded that HEF immediately provide the funds to cover the refund of these advance deposits even though some related to reservations several years in the future when the Resort, by any reasonable forecast, should have been reopened. . . . Four Seasons acted on its own to protect its reputation by apparently refunding the advance deposits out of its own funds without HEF's knowledge or approval and without providing any documentation to HEF.

(HEF Response, ¶ 21.) As HEF and Maritz Wolff well know, and as is customary in the industry, it has always been the Hotel's practice to use the deposits that customers pay to secure their future reservations to fund ongoing Hotel operations during the slow season and then recognize those deposits as income when the guests have completed their stay. This practice benefited HEF by reducing the need for working capital infusions from the owner during the Hotel's slow season. So when the Hotel was closed after Hurricane Omar, the customer deposits had been spent and the Hotel owed millions of dollars to customers whose reservations were cancelled. Contrary to HEF's assertion, *over 95% of these amounts related to reservations for the 12-month period after the hurricane.* As for documentation, Four Seasons sent an email on October 19, 2008, two weeks after the hurricane, listing all the advance deposits and asking HEF for funds to repay them. (Exhibit C.) HEF refused, though it acknowledged that these were valid Hotel

obligations, and asked the lenders to provide funding to repay them. (Exhibit C.) When the lenders refused, Four Seasons exercised its right under the HMA to fund on HEF's behalf the amounts necessary to enable the Hotel to repay the guests and extinguish the Hotel's clear liability to them. Four Seasons is still awaiting repayment of the amounts it funded.

(d) HEF goes on at some length about the lawsuit filed by the villa owners against HEF, Maritz Wolff, and others alleging fraudulent transfer and breach of contract. HEF wonders aloud why Four Seasons was not named as a defendant, and voices its suspicion that Four Seasons has been "encouraging" the villa owners. Such groundless speculation hardly merits a response; but the truth is Four Seasons had no role or involvement in the villa owners' decision to file suit and has not cooperated with them in that litigation. We do not know why the villa owners decided not to sue Four Seasons, but presumably it is because they are happy with Four Seasons' performance, value Four Seasons' role as operator, and believe their claims lie against HEF.

19. For all its talk of problems and complaints, HEF has used the HMA's dispute resolution process only once. The HMA provides a process for HEF to approve an annual plan and budget submitted by Four Seasons, and HEF approved the plan and budget each year until 2008.[5] Likewise, during the time it was Controlling Lender, Redtail did not once inform Four Seasons that it objected to any operational decision or expenditure.

---

[5] The issue in question in the 2008 annual plan was the method of accounting for "service charges" — which are different from tips. HEF commenced an arbitration under the HMA and then later dismissed it.

- 10 -

DEL1 74881-1

C. **The Bankruptcy Plan**

20. After the February 2009 letter from Maritz Wolff withdrawing from the Hotel, HEF stopped playing an active role in either the rebuilding process or ongoing operations. Throughout this period and up to the present, HEF has provided no funding for the Hotel.

21. Unbeknownst to Four Seasons, sometime last fall Maritz Wolff began talking to Redtail, which had just become the Controlling Lender, about a plan to take control of the Hotel. These parties developed a scheme to prevent a foreclosure, delay the reopening, and terminate Four Seasons as operator.

22. This plan is set forth in a PowerPoint presentation produced by Redtail/Capstead in its document production.[6] (Exhibit D.) The presentation explains in detail how Maritz Wolff would benefit from the plan. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ The presentation is notably vague as to how HEF or its other creditors might benefit.

23. Both Redtail and Maritz Wolff recognized Four Seasons would have a claim for tens of millions dollars in damages for early termination of the HMA. To insulate HEF and themselves from this liability, they decided to use a "prepackaged bankruptcy" to terminate the HMA. The PowerPoint presentation is quite explicit in discussing the scheme:

---

[6] In its production, Redtail/Capstead designated the PowerPoint presentation as "Confidential." Four Seasons reserves all rights to contest such designation but, in accordance with Delaware Bankruptcy Local Rule 9018, will treat the presentation as confidential until the Court orders otherwise, and will move to file Exhibit D and a non-redacted version of this Reply under seal.



24. Two things happened to derail this plan. First, in December 2009, Calyon took over as the Controlling Lender, so Redtail no longer had control under the Participation Agreement. Second, in February 2010, after conducting an investigation that included review of Hotel financial information as well as discussions with HEF and Four Seasons, and consistent with their obligations under the NDA, Wells Fargo and Calyon rejected the "prepackaged bankruptcy plan," and Calyon directed Wells Fargo to proceed with the foreclosure. A foreclosure was scheduled for March 25, 2010.

25. At this point, Redtail/Capstead apparently decided to move ahead with the bankruptcy plan without the support of the other lenders, in an attempt to stop the foreclosure. But Redtail was barred from commencing a bankruptcy proceeding under the Participation Agreement and the NDA; and neither Maritz Wolff nor HEF could commence a voluntary bankruptcy proceeding without triggering "springing" guarantees under the Loan Agreements. Therefore, in an apparent effort to circumvent these contractual restrictions, Capstead filed the involuntary petition.

26. On March 19, 2010, Capstead filed the involuntary petition against HEF. It did so on the basis of a purported loan for $275,000 given on December 11, 2009, which it

characterizes as an "advance" made on behalf of HEF to pay the retainer fee for its bankruptcy counsel. Apart from being Redtail's indirect parent, Capstead had no other interest in the Hotel. According to the Capstead/Redtail Objection, Capstead made this advance because it wanted to protect the rights of HEF and because its subsidiary "Redtail did not have access to sufficient funds." (Capstead/Redtail Objection, ¶ 42.)

27. HEF, for its part, denies that the $275,000 paid by Capstead was a loan. The Loan Agreement bars HEF from incurring other debt (with certain exceptions not applicable here). According to HEF, Capstead "agreed to fund HEF's professional fee retainers to allow HEF to prepare for the bankruptcy filing . . . Such funding was not a loan to HEF." (HEF Response, ¶ 3.)

28. Documentation to support Capstead's purported loan is notably absent. Four Seasons, which maintains HEF's Hotel books and accounts under the HMA, has no record of it. Last week, Capstead produced documents in connection with the Motion pursuant to this Court's April 19 Scheduling Order. Four Seasons has reviewed Capstead's production and has not found a single document evidencing the purported loan.

29. Were the HMA to be rejected, Four Seasons would have a claim for rejection damages against the Alleged Debtor for management fees running through the remaining term of the HMA, which runs until 2021, plus extensions for an additional 55 years. While Four Seasons has not calculated its damages, it notes that management fees for 2007, the last full year the Hotel was operated before the hurricane, were just under $3 million. These claims would be added to the amounts already owing Four Seasons for the refund of advance deposits, for reimbursement of various charges incurred by Four Seasons on behalf of the Hotel, for pre-

Hurricane Omar amounts still owed to Four Seasons, and for unpaid management fees since the hurricane.

## ARGUMENT

A. **The Court Should Dismiss the Bankruptcy Case For Cause Under Section 1112(b) of the Bankruptcy Code.**

30. As set forth in the Motion, section 1112(b) of the Bankruptcy Code authorizes dismissal of a chapter 11 case "for cause." Under the language of the statute, upon a showing of "cause," the court is required to dismiss the case (or convert it to a chapter 7 proceeding), unless the debtor can prove the existence of "unusual circumstances specifically identified by the court" that establish that the requested dismissal is not in the best interests of creditors and the estate. See In re The SCO Group, Inc., Case No. 07-11337, 2009 WL 2425755, at *5 (Bankr. D. Del. Aug. 5, 2009).

31. Congress recently amended section 1112(b) to strengthen the authority of judges to dismiss cases for cause.[7] While the former statute used permissive language ("may"), the current statute provides that, absent unusual circumstances, the court "*shall*" dismiss or convert a case if the party requesting dismissal establishes cause. "The amendments to [section] 1112 limit the Court's discretion to refuse to dismiss or convert a [c]hapter 11 case upon a finding of cause." Wiener, Steele & Assocs. v. Gateway Access Solutions, Inc. (In re Gateway Access Solutions, Inc.), 374 B.R. 556, 560 (Bankr. M.D. Pa. 2007); accord SCO Group, 2009 WL 2425755, at *5 n.7 ("Congress clearly intended to make conversion or dismissal mandatory upon proof of 'cause.'").

---

[7] The revision was part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.

32.     As amended, section 1112(b) establishes a burden-shifting regime. The initial burden lies with the party requesting dismissal to show "cause." Gateway, 374 B.R. at 561. In the Third Circuit, it is well established that chapter 11 petitions may be dismissed for "cause" if not filed in good faith. In re SGL Carbon Corp., 200 F.3d 154, 162 (3d Cir. 1999) ("[We] conclude a Chapter 11 petition is subject to dismissal for 'cause' under 11 U.S.C. § 1112(b) unless it is filed in good faith."). Under section 1112(b)(4)(a), cause also exists if there is a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." Once the party requesting dismissal establishes "cause," the burden shifts to the non-moving party to prove that unusual circumstances exist that make dismissal inappropriate. Gateway, 374 B.R. at 561; accord In re Strawbridge, Case No. 09-17208, 2010 WL 779267, at *4 (Bankr. S.D.N.Y. Mar. 5, 2010).

33.     In assessing whether the petitioning creditors filed the involuntary petition in good faith, this Court must determine where the "petition falls along the spectrum ranging from the clearly acceptable to the patently abusive." In re Am. Capital Equip., LLC, 296 Fed. Appx. 270, 273 (3d Cir. 2008) (quoting In re Integrated Telecom Express, Inc., 384 F.3d 108, 118 (3d Cir. 2004)). Of particular relevance to this inquiry is whether the petition serves a "valid bankruptcy purpose" by either (1) preserving a going concern or (2) "maximizing property available to satisfy creditors." Id. (quoting Integrated Telecom, 384 F.3d at 119-20). "If neither of these purposes can be demonstrated, the petition will be dismissed." Id. at 274.

34.     Moreover, in cases where the true purpose for filing a chapter 11 petition was not to reorganize a financially distressed business, but to take advantage of the rejection provisions available under the Bankruptcy Code, bankruptcy courts have found that dismissal is appropriate. See, e.g., In re S. Cal. Sound Sys., Inc., 69 B.R. 893, 900 (Bankr. S.D. Cal. 1987) (granting

motion to dismiss where debtor's president's declaration made clear that the sole reason for the bankruptcy filing was to reject an executory contract and the debtor had no "real creditors clamoring to enforce . . . real debt"). Likewise, dismissal is appropriate where, as here, (i) the debtor has disclaimed any interest in reorganizing, (ii) the petition was filed to stay a foreclosure sale, (iii) the filing circumvents another party's right to consent to the petition, and (iv) the debtor has few significant creditors other than its secured lenders. See, e.g., In re Global Ship Sys., LLC, 391 B.R. 193, 202–05 (Bankr. S.D. Ga. 2007); In re 801 S. Wells St. Ltd. P'Ship., 192 B.R. 718, 726–27 (Bankr. N.D. Ill. 1996).

**B.    The Evidence Presented Demonstrates Bad Faith, Continuing Diminution of Value, and Inability to Successfully Reorganize—All Grounds for Dismissal.**

35.    In light of these legal standards, the evidence presented in connection with the Motion provides several grounds for dismissal.

**1.    The Petition was filed in bad faith, for an improper purpose.**

36.    The purpose of the involuntary petition was not, as Redtail/Capstead and Maritz Wolff contend, to enhance the value of the estate and protect the creditors of HEF. Rather, they devised the prepackaged bankruptcy plan to advance their own interests. They sought to terminate the HMA and remove Four Seasons as operator in a way that they hoped would insulate them from liability for breach of contract. (Capstead/Redtail Objection, at 23–24; Exhibit D.) And Maritz Wolff intends to engage in self-dealing by transferring management of the Hotel and associated revenues to a company it controls.

37.    When Redtail was replaced as Controlling Lender and Calyon rejected the prepackaged bankruptcy proposal, Redtail/Capstead proceeded with the bankruptcy filing in order to stop the scheduled foreclosure sale and regain the Controlling Lender position. In such situations, where "the petition is filed merely to obtain a tactical litigation advantage," the

bankruptcy case should be dismissed. Am. Capital, 296 Fed. Appx. at 274. If the sole purpose of a bankruptcy petition is to obtain an advantage in litigation, "the petition is considered to have fallen outside the legitimate scope of the bankruptcy laws." Id.

38. HEF's other creditors have little to gain from this bankruptcy proceeding. There is no realistic possibility that the value of the Hotel will exceed the amounts due under the Loan. The most likely result of this proceeding is that the unsecured creditors will see their claims extinguished without receiving any payment. Moreover, the claims of other creditors would be diluted by the significant damages owed to Four Seasons for early termination of the HMA.[8]

39. Redtail/Capstead and HEF also offer the vague hope that their reorganization plan may enhance the future profitability of the Hotel. But even assuming that unsecured creditors obtained an equity position in the debtor, any future profits would be used (1) to service the Loan, (2) to pay management fees to the Maritz Wolff-controlled operator, and (3) to pay asset management fees to Maritz Wolff — before any funds would be available for distribution to HEF's owners.

---

[8] While rejection of the HMA is not at issue in the Motion, we note that rejection will not be permitted where it will merely create a new burden to the estate to the detriment of other creditors. See, e.g., In re H.M. Bowness, Inc., 89 B.R. 238, 241 (Bankr. M.D. Fla. 1988) (recognizing that a request to reject an executory contract may be denied when that rejection creates a large claim against the estate by the non-rejecting party); 3 Collier on Bankruptcy ¶ 365.03 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.) (stating that if the direct gain in value to the reorganized debtor does not make up in creditor recoveries for the dilution in creditor recoveries resulting from the rejection damage claim, then absent some other consideration favoring rejection to facilitate the reorganization or to enhance value indirectly, the court may consider withholding approval of the rejection as manifestly unreasonable). Here, rejection of the HMA would result in a large damage liability on the part of the estate to the detriment of the other unsecured creditors.

## 2. The Questionable Circumstances Surrounding Capstead's Purported Loan and the Commencement of this Proceeding Provide Further Indicia of Bad Faith.

40. As described in detail above, the debt Capstead used to initiate this bankruptcy case is highly questionable. The evidence suggests that the parties conjured up a phony loan so that Capstead could initiate a bankruptcy proceeding and thus do what Redtail, Maritz Wolff, and HEF could not. There are doubts over whether the loan was actually made, given that Capstead in its document production provided no documentation to support it. There are doubts over whether the debt is valid, given that HEF denies that the payment was a loan. There are doubts over whether the loan was made for a proper purpose, given that HEF is barred from taking on debt and Capstead had no purpose in advancing the money other than to support the bankruptcy scheme.

41. In addition, the questionable means Capstead used to solicit other creditors in Nevis to join in the petition provide a further indication of bad faith. Four Seasons does not dispute that petitioning creditors (Berglund and Island Water World) have legitimate debts, albeit relatively small ones. And Four Seasons understand that the new "secret" creditors included in the proposed amended petition may have legitimate claims. But these other creditors have not participated in this case to date, and Capstead/Redtail's lawyers have been acting on their behalf. It seems apparent that this proceeding is being driven by Capstead/Redtail for its own benefit and the benefit of Maritz Wolff.

## 3. It Is Highly Unlikely that the Contemplated Scheme Has Any Likelihood of Being Adopted.

42. In their Objection, Capstead and Redtail state that the "cornerstone of the Alleged Debtor's rehabilitation and effective reorganization is the rejection of the Four Seasons Management Agreement." (Capstead/Redtail Objection, ¶ 2.) If the appropriate time comes,

Four Seasons will demonstrate that the HMA is not burdensome, nor is it in the best interest of the Hotel or its creditors to replace Four Seasons with an operator controlled by Maritz Wolff. The other key parties — Wells Fargo, Calyon, the villa owners, and the Government of Nevis, which hold a variety of economic stakes in the Hotel — all agree with Four Seasons on this point.

43. These other parties have stated their objection to removing Four Seasons as operator. Four Seasons, which likely would be one of the largest unsecured creditors in any bankruptcy proceeding, would also oppose such a reorganization plan. In light of the opposition of all these parties, it is doubtful that the plan proposed by Capstead/Redtail and Maritz Wolff could be approved.

### 4. This Proceeding Threatens to Erode and Perhaps Destroy the Value of the Hotel, to the Detriment of All Interested Parties.

44. To permit this bankruptcy proceeding to continue — while Capstead/Redtail try to justify their activities, shop for other creditors, and/or attempt to support their self-serving and unrealistic plan — would serve no legitimate purpose. Continuing delay in the foreclosure sale only serves to continue the diminution in value of the estate's interest in the Hotel. If the lenders are not permitted to proceed with the foreclosure sale in the very near future, it will be impossible to reopen the Hotel in time for next winter's busy season. Significant revenues will be lost and the value of the Hotel will be reduced further. It is possible that an extended bankruptcy proceeding could force the Hotel to close permanently, causing irreparable harm to the villa owners and the citizens of Nevis.

45. All these results can be avoided if Wells Fargo is permitted to proceed with its plan to foreclose, rebuild, and reopen the Hotel, with the support of Four Seasons and the other

key stakeholders. The Court has more than ample grounds to find that the involuntary petition was filed in bad faith and that cause exists to dismiss this case.

WHEREFORE, Four Seasons respectfully requests that the Court enter an order granting the Motion and such other and further relief as the Court deems just and proper.

Dated: April 27, 2010
Wilmington, Delaware

Respectfully submitted,

*/s/ Joanne B. Wills*
Joanne B. Wills, Esq. (No. 2357)
KLEHR HARRISON HARVEY
BRANZBURG LLP
919 Market Street, Suite 1000
Wilmington, DE 19801
Telephone: 302.426.1189
Facsimile: 302.426.9193

-and-

Lorraine S. McGowen, Esq. (Admitted *Pro Hac Vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, New York 10019
Telephone: 212.506.5114
Facsimile: 212.506.5151

-and-

James W. Burke, Esq. (Admitted *Pro Hac Vice*)*
ORRICK, HERRINGTON & SUTCLIFFE LLP
1152 15th Street, N.W.
Washington, D.C. 20005
Telephone: 202.339.8400
Facsimile: 202.339.8500
*Admitted only in Virginia

*Counsel for Four Seasons*